Ralph A. Burster, Administrator of the Estate of George Burster, Deceased, Appellant, v. National Refining Company, Appellee.

**Gen. No. 8,737.**

Heard in this court at the October term, 1933. Opinion filed February 19, 1934.

John E. Cassidy, for appellant.

Eckert & Peterson, for appellee; A. R. Peterson and Owen Rall, of counsel.

Mr. Presiding Justice Wolfe delivered the opinion of the court.

Ralph A. Burster as administrator of the estate of George Burster, deceased, filed a suit in the circuit court of Peoria county, against the National Refining Company, a corporation, and L. G. Shockey, as joint defendants. The declaration charges that on May 29, 1931, the defendant Shockey was driving an automobile in his own behalf and as agent and servant of the National Refining Company in Woodford county near the town of El Paso, on a paved road designated as State Route No. 8; that the automobile that the defendant, Shockey, was driving, collided with the automobile in which George Burster, a minor child, 12 years of age, was riding; that by reason of the negligence of Shockey, in his own behalf and as agent and servant of the defendant, the National Refining Company, the plaintiff's intestate was killed.

To this declaration the defendant, Shockey, filed a plea of general issue. The National Refining Company also filed a plea of the general issue, and in addition thereto filed special pleas denying that they owned the automobile that Shockey was driving, and did not operate or control the same. The case came on for trial and at the close of the plaintiff's evidence, on motion of the National Refining Company, the court instructed the jury to find the National Refining Company not guilty. The case proceeded against Shockey and the jury returned a verdict finding Shockey guilty and assessed the plaintiff's damages at $10,000. The plaintiff excepted to the ruling of the court in directing a verdict in favor of the Refining Company, and has perfected an appeal to this court to review that question.

For a period of five years or more before the accident, the defendant, Shockey, had been in the employ of the Refining Company as a salesman. He resided

with his family at Woodstock, Illinois, and worked for this company in an assigned territory, which includes several counties in the northeastern part of Illinois and the southeastern part of Wisconsin. Shockey's duties required him to call upon customers and prospective ones in the towns located in these counties for the purpose of promoting the sale of the products of the National Refining Company. He was to take orders and distribute literature and signs, and perform such duties as are usually done by salesmen.

The office of the National Refining Company which had supervision over Shockey and the territory in which he worked was located in Peoria, Illinois. The manager of the Peoria office was Mr. W. H. Allen, and the assistant manager was Mr. P. A. Wyler. Communication was carried on between Shockey and the Peoria office by means of the U. S. mails. Shockey made daily reports of his work to his employer with respect to his operations and sales. This information was given on a printed blank furnished by the Refining Company and mailed to the Peoria office each day. The blank contained space for information about Shockey's expenses. These daily reports to the company were the official report. All other communication was by correspondence between the main office and Mr. Shockey's headquarters, which were at his home in Woodstock. On the day of the accident and for a year and a half immediately preceding, Shockey owned an Essex automobile, in which he traveled from town to town in the course of his work for the National Refining Company. It was the usual method of transportation used by him at that time. The National Refining Company paid Shockey a salary of $200 per month, and in consideration of the use of his car the Refining Company paid Shockey $2 per day. When Shockey was proceeding about his business in his assigned territory he carried a portfolio, and advertising

literature of the Refining Company. In his car he transported signs of the company, which advertised its products, such as Enarco Motor Oil and White Rose Gasoline. The literature and signs were usually shipped to Shockey's home from the Peoria office of the company. On the spare tire of his Essex automobile was a tire cover with advertising of the National Refining Company's products.

Before May 29, 1931, it had been the practice of the National Refining Company to hold sales meetings in the City of Peoria about three times a year. To these gatherings, salesmen such as Shockey were called from all parts of the Peoria district to attend the meetings, which usually lasted the greater part of one day. After the business of the day was finished they were dismissed and were free to return to their several territories. In requesting their different salesmen to attend these meetings, the Refining Company gave no directions as to the routes or methods the salesmen should come from their respective homes to Peoria, but were usually allowed railroad mileage from their homes to the City of Peoria. On Friday, May 28, 1931, Shockey had been working in his assigned territory. On his arrival at his home in Woodstock, he received word from his superior, Mr. Allen, by mail, that he should be in Peoria at 8:30 o'clock in the morning of the following day, for the purpose of attending a sales meeting of the National Refining Company. This meeting was to be held at the Jefferson Hotel in the City of Peoria. Mr. Shockey left his home in Woodstock on Saturday morning at 3:30 o'clock a. m., in his Essex automobile. He drove the car himself. He arrived in the City of Peoria, proceeded to the Jefferson Hotel and attended the meeting of the salesmen of the National Refining Company. The meeting was presided over by Mr. Allen, superintendent of the Peoria office. It continued until about 4:30 p. m., when the

meeting was dismissed. After the meeting Shockey went to the company's office, a distance of about two miles, and obtained a quantity of envelopes, reports and order books and some of the company's signs for distribution in his territory. At the office he also received his salary and expense account check, which was figured on the basis of his railroad fare from his home in Woodstock to Chicago and from Chicago to Peoria, and the return fare the same way. Mr. Shockey had his check cashed at a store in Peoria, after which he placed the signs and literature that he had procured at the main office, in his automobile and started for his home in Woodstock. On his way home the collision occurred which caused the death of George Burster, plaintiff's intestate.

It is insisted by the appellant that the court erred in not permitting the jury to pass upon the question of fact whether at the time of the accident, the defendant, Shockey, was a servant of the National Refining Company, and whether Shockey was then and there acting within the scope of his employment at the time the collision occurred. The appellant contends that this was a question of fact that should have been left to the jury to decide. On the other hand the appellees contend that the evidence clearly establishes the fact that at the time of the collision, Shockey was not a servant of the Refining Company, but was an independent contractor; therefore, it was the duty of the court to direct a verdict in their favor.

Neither the Supreme Court nor Appellate Courts have passed upon the question now presented for adjudication. The case of *Meece v. Holland Furnace Co.,* 269 Ill. App. 164, is cited by the appellees as being authority for their contention. In the *Meece v. Holland Furnace Co.* case, Meece was employed as a salesman for the Holland Furnace Company; the time and effort that he spent in his work were left wholly to him.

He did not receive any stated salary for his services, but worked on a commission basis. The Appellate Court of the Third District in the *Meece* case have reviewed quite a number of cases that are similar to this case that we are now considering. This is beneficial to us in making an analysis of a great many of the cases that the parties to this suit now rely upon. They follow the rule as laid down in a great many courts, that an independent contractor is one who renders service, representing the will of the person for whom the work is done, only as to the result of his work and not as to the means by which it is accomplished.

In the case of *American Sav. Life Ins. Co. v. Riplinger*, 249 Ky. 8, 60 S. W. (2d) 115, the court held that the Life Insurance Company was not liable for the injury to a pedestrian caused by the negligence of one of their soliciting agents employed on a commission basis; while in connection with this work he was driving his wife's automobile. The court in that case say: ''A master within the doctrine of *respondeat superior* is the one who cannot only order the work, but also how it should be done. The doctrine applies only where the relationship of master and servant exists at the time and in respect to the thing causing the injury and from which it arose and then only when the one sought to be charged has some right in some way to control the conduct of the party having caused the injury.''

The court in the case of *Williams v. National Cash Register Co.*, 157 Ky. 836, 164 S. W. 112, after discussing the contract of employment between the agent and the Cash Register Company, stated that the company had a right to direct and control the method of delivery of their cash registers, and held the Cash Register Company liable for the injury caused by the automobile of their agent. The court in that case held that the man was the agent, and not an independent contractor, and

in their opinion say: "The test of the relationship is the right to control. It is not the fact of actual interference with the control but the right to interfere that makes the difference between an independent contractor and a servant or agent. To enlarge the test is whether the employee represents his employer as to the result of the work only, or as to the means as well as the result. If the employee is merely subject to the control or direction of the owner or his agent as to the result to be obtained, he is an independent contractor. If the employee is subject to the control of the employer as to the means, he is not an independent contractor."

The National Refining Company contends that even though Mr. Shockey may not have been an independent contractor with reference to his relationship to the company, he was an independent contractor with reference to the use and operation of the automobile at the time and place of the accident involved; that in operating the automobile Shockey was not a servant of the Refining Company, but was an independent contractor; that because the company had no control over the operation of the motor vehicle in question by Shockey, the defendant is not liable for the negligence of Shockey at the time of the accident in question.

The courts frequently refer to the lack of control as establishing the relationship of an independent contractor, but an examination of the cases discloses that it is not essential that this relation at all times be an independent relationship, but they hold that the employment may partake, with respect to certain elements, of a master and servant relationship, and with respect to other elements may partake of an independent contractor relationship. In the case of *Nettleship v. Shipman,* 161 Wash. 292, 296 Pac. 1056, the court in discussing the facts similar to the case now before us held: That where the defendant had no con-

trol whatever over the salesman in the transaction of his work, nor the method of locomotion which he might take in the transaction of such work but was only interested in the results thereof that under such circumstances he was a subcontractor and not a servant of the defendant. *LaMay v. Industrial Commission,* 292 Ill. 76.

The court in the case of *American Sav. Life Ins. Co. v. Riplinger,* 249 Ky. 8, 60 S. W. (2d) 115, in discussing the manner of determining whether a person is a servant of his employer or an independent contractor or whether sometimes the employee may act in a dual capacity have this to say: ''The method of payment, the right to discharge, the right to control the result of the work, the fact that the employee is at the time engaged in no other employment, are to be considered in determining whether the right to control the means by which the result is accomplished is also in the employer, but they are subordinate to the latter right, since a person may be a servant or agent as to one part of the undertaking and an independent contractor as to other parts.''

Perhaps the leading case on the subject of master and servant and an independent contractor is *Pyyny v. Loose-Wiles Biscuit Co.,* 253 Mass. 574, 149 N. E. 541. The facts in the *Pyyny* case and the questions of law involved are so nearly the same as in this case that we quote at length from that case: ''This is an action of tort to recover damages to the automobile of the plaintiff, caused by a collision with an automobile driven by one Bancroft. It is admitted that Bancroft, as a traveling salesman, was in general employment of the defendant. It is also 'admitted that Bancroft was negligent and that the plaintiff was careful.' The sole issue raised by the exceptions, taken by the defendant to the refusal of the trial judge to direct a verdict for the defendant, 'is whether or not at the

time of the accident said Bancroft was operating the automobile in the course of his employment as a salesman of the defendant under such circumstances that the defendant is liable for his negligence at that time.'

"Upon the question of the legal relationship between Bancroft and the defendant, the facts in their aspect most favorable to the plaintiff taken from the examination and cross-examination of Bancroft, in substance are that he had been a traveling salesman for the defendant company since August, 1923, and was such at the trial in March, 1925; that 'he had no regular hours to work; his time is his own and the trade that he can see any time at all during the 24 hours a day, he tries to see them'; that he owned the automobile that was in the collision, and used it in his business as traveling salesman; that his sole business was to sell biscuits for the defendant; that he was paid a salary and commission and the expense of operating the car; that he always carried a sample case and advertisements in the back of his Ford coupe car, and they were in the car at the time of the accident.

"It further appeared, in substance, that about 1 o'clock on the day of the accident he drove from Leominster to an Elks' Field Day picnic at Fort Pond, in Lancaster, and remained there until around 4 o'clock, when he went to a weekly sales meeting in Fitchburg; that after the sales meeting, at a quarter to 5, he started in the car with a friend whom he had found at the picnic to return to Fort Pond; and that the accident happened on the road between Lunenburg and the pond at Lancaster. It further appeared, in substance, that 'he did selling until he got to the Field Day'; that he 'was going back to see some of his trade'; that 'he didn't have an appointment with any one in particular; didn't expect to see any individual, but as a whole expected to see some of his trade there; he intended to do business with them if he should see them.'

"On the above facts it is plain Bancroft was his own master in respect to the time he should devote to the business of the defendant, and to the place within certain designated territory where he should solicit sales. It is also plain that it was his duty and not that of the defendant to register the automobile and obtain a license to operate it. The defendant had no right on the reported facts to direct the manner in which Bancroft should control his car. It assumed no obligation to keep the car in repair other than is involved in its agreement to pay the expense of operating it, or, as the plaintiff puts it in his brief, to pay 'so much per mile for the number of miles that he (Bancroft) operated said car for them in connection with his employment. The exceptions must be sustained and judgment entered for the defendant.' "

In the case of *Stockwell v. Morris,* — Wyo. —, 22 P. (2d) 189, the facts are very similar to the case now before us. After an exhaustive review of similar cases in other states, the court held that the salesman for the Maytag Company (Morris—employee) was in the service of the company but was an independent contractor and the Maytag Company was not liable for the damage caused by Morris. Many of the cases cited in the appellants' and appellees' briefs are discussed in this elaborate opinion of the court in the *Stockwell* case.

We have examined the cases cited by the appellant as tending to show that Shockey was a servant of the National Refining Company at the time of the collision of the automobiles which caused the death of the plaintiff's intestate. In all or nearly all of the cases cited, the company had retained the authority to direct the means and the manner in which their salesmen should conduct the business.

The evidence in this case shows that at the time of the collision, Shockey was driving his own automobile and not at the direction or under the control of the

National Refining Company; that to some extent in the performance of his duties he was under the direction and control of the Refining Company but so far as his actual movements were concerned he was free to go at any time or place in certain designated territory to transact his business; that Shockey in going to and from the salesmen's meetings at Peoria, used his own discretion in how he should travel, and that at the time of the collision he was not acting as a servant of the National Refining Company. Therefore, we conclude that the trial court properly directed the jury to find a verdict in favor of the National Refining Company, and the judgment of the circuit court of Peoria county should be affirmed.

*Judgment affirmed.*